# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **No. 03-0282** |
| **NOAH MOORE** | **SECTION: I/2** |

## ORDER AND REASONS

Before this Court is the motion of defendant, Noah Moore ("Moore"), to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. For the following reasons, Moore's motion is **DENIED**.

### *BACKGROUND*

In December, 1993, Moore began serving a 295-month sentence in federal prison for conspiracy to distribute and possess with intent to distribute cocaine and for use of a firearm in a drug trafficking offense.[1] On September 11, 2003, while still serving that sentence, Moore was indicted with one count of conspiracy to distribute and possess with intent to distribute more than 100 grams of heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846.[2] The case proceeded to trial, beginning on May 17, 2004.

At trial, the government's evidence showed that Moore conspired to import heroin from Nigeria into the United States for distribution. After Moore was incarcerated in 1993, he was visited by his friend, Hillary Williams ("Williams"). Moore introduced Williams to a fellow

---

[1] See United States v. Noah Moore, Jr., Criminal Action No. 92-469.

[2] R. Doc. No. 1.

1

inmate, Tunde Ademuiiwa ("Tunde")[3], whom Moore had ostensibly engaged to assist with Moore's legal appeal. Williams began to collect money on Moore's behalf to pay for Tunde's legal services. Tunde was soon thereafter released from prison and deported to Nigeria. From Nigeria, Tunde began calling Williams and asking for money; Tunde told Williams that Moore owed him (Tunde) $50,000. Eventually, Moore admitted to Williams that he knew Tunde was a heroin dealer and that he owed Tunde the $50,000 because his (Moore's) family and friends had stolen that amount of money from him (Tunde).

Moore relied on Williams to help repay his debt to Tunde. Moore informed Williams that Tunde would be sending heroin, hidden inside African art books, to Williams via international courier. Tunde sent Williams three such books between December, 2002 and January, 2003, and Williams sent $10,000 to Tunde. Williams intended to order additional heroin from Tunde, resell it in the U.S., and forward the proceeds to Tunde. Eventually, Williams's involvement was uncovered by the Drug Enforcement Agency ("DEA") and he began cooperating as an informant for the government. He explained the importation scheme to the government, introduced undercover DEA agents to Tunde, and ultimately testified at trial.

At trial, the government also played audio recordings of conversations between Moore and Tunde over the prison telephone. During these conversation, Moore and Tunde spoke in code about the heroin importation scheme. Moore, who testified at trial, maintained that the conversations were not coded discussions about drugs but were legitimate conversations about his legal appeal and various legitimate business dealings he and Tunde were planning. Moore testified that he had no knowledge of any heroin importation conspiracy.

---

[3] The Court, like the parties, refers to Tunde Ademuiiwa as "Tunde."

On May 20, 2004, the jury found Moore guilty.[4] This Court entered judgment on October 6, 2004, and sentenced Moore to a term of 200 months imprisonment to run consecutively to the sentence he was already serving.[5] On appeal, the Fifth Circuit Court of Appeals affirmed Moore's conviction, but remanded to this Court for re-sentencing in light of *United States v. Booker*, 543 U.S. 220 (2005).[6] This Court resentenced Moore on November 2, 2006 to the same 200-month prison term, again to run consecutively to the 1993 sentence.[7] On November 7, 2006, Moore appealed this latter sentence to the Fifth Circuit;[8] the sentence was affirmed on July 8, 2007.[9]

Moore filed a motion to vacate pursuant to 28 U.S.C. § 2255 on October 10, 2007, alleging that: (1) his counsel was ineffective in failing to raise an objection to witness testimony; (2) his counsel was ineffective in failing to advise Moore to plead guilty; and (3) his counsel was ineffective in failing to compel discovery of various audio recordings and phone call logs.[10]

## LAW AND ANALYSIS

---

[4] R. Doc. No. 72.

[5] R. Doc. No. 111.

[6] R. Doc. No. 140-2 at 19.

[7] R. Doc. No. 154.

[8] R. Doc. No. 156.

[9] R. Doc. No. 180. In addition, on April 4, 2007, Moore moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. On July 6, 2007, this Court denied Moore's motion for a new trial. He then appealed the denial of his motion for a new trial to the Fifth Circuit on July 24, 2007. The Fifth Circuit affirmed this Court's denial of Moore's motion for a new trial on July 11, 2008.

[10] Moore supplemented his initial two claims with the third claim by way of supplemental submission filed on July 21, 2008. R. Doc. No. 208. Moore has also filed a "Traverse." R. Doc. No. 222.

3

## I. OVERVIEW OF 28 U.S.C. § 2255

Section 2255 allows a prisoner in custody to attack his sentence if it was "imposed in violation of the Constitution or laws of the United States," or if "the court was without jurisdiction to impose such sentence," or if "the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."[11] "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." *United States v. Segler*, 37 F.3d 1131, 1133 (5th Cir. 1994) (*quoting United States v. Vaughn*, 955 F.2d 367, 368 (5th Cir. 1992) (per curiam)).

"Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate 'cause' and 'actual prejudice,' or that he is 'actually innocent.'" *Murray v. Carrier*, 477 U.S. 478, 485, 496 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977); *Smith v. Murray*, 477 U.S. 527, 537 (1986); *Bousley v. United States*, 523 U.S. 614, 622 (1998). "This cause and actual prejudice standard presents 'a significantly higher hurdle' than the 'plain error' standard that we apply on direct appeal." *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991) (en banc) (*quoting United States v. Frady*, 456 U.S. 152, 166 (1982)).

To demonstrate "cause" requires that the defendant demonstrate that "'some objective factor external to the defendant' prevented him from raising on direct appeal the claim he now advances." *Romero v. Collins*, 961 F.2d 1181, 1183 (5th Cir. 1992) (*quoting Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Objective factors that constitute "cause" include interference by

---

[11] 28 U.S.C. § 2255.

4

officials that makes compliance with the procedural rule impracticable, a showing that the factual or legal basis for the claim was not reasonably available to counsel at the prior occasion, and ineffective assistance of counsel. *Murray*, 477 U.S. at 488; *United States v. Guerra*, 94 F.3d 989, 993 (5th Cir. 1996).

Here, the defendant claims that he is entitled to relief under § 2255 because he received ineffective assistance of counsel. Since the Sixth Amendment requires that criminal defendants receive effective assistance of counsel, the defendant's ineffective assistance of counsel claim is of constitutional magnitude. Ineffective assistance of counsel claims satisfy the cause-and-prejudice standard. *United States v. Patten*, 40 F.3d 774, 776 (5th Cir. 1994) (per curiam); *United States v. Pierce*, 959 F.2d 1297, 1301 (5th Cir. 1992). These claims satisfy the "cause and prejudice" standard because they are ordinarily brought for the first time on collateral review due to the difficulty of compiling an adequate record by the time of direct appeal. *See Pierce*, 959 F.2d at 1301. Furthermore, the Supreme Court has held that defendants may raise ineffective assistance of counsel for the first time on collateral review even if the defendant had possessed an adequate record by the time of direct appeal. *Massaro v. United States*, 538 U.S. 500, 504 (2004). The *Massaro* Court explained that a trial transcript is unlikely to show the existence of conflicts of interest or whether or not trial counsel's actions were supported by reasonable strategy. *Id*. at 505. The Court thus concluded that "the better-reasoned approach is to permit ineffective-assistance claims to be brought in the first instance in a timely motion in the district court under § 2255." *Id*. at 504. Therefore, this Court must consider the defendant's ineffective assistance claims because they are of constitutional magnitude and satisfy the "cause and prejudice" standard.

5

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

*A. Standard of Law*

The standard for judging the performance of counsel was established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel that requires the petitioner to prove (1) deficient performance and (2) resulting prejudice. *Strickland*, 466 U.S. at 697. In order to satisfy the first *Strickland* prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; see also *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. A defendant must satisfy both prongs of the *Strickland* test in order to be successful on an ineffective assistance claim. See *Strickland*, 466 U.S. at 697. There is no reason for a court deciding an ineffective assistance of counsel claim to address these prongs in any particular order. *Id.* If it is possible to dispose of an ineffective assistance of counsel claim without addressing both prongs "that course should be followed." *Id.*

On federal habeas review, scrutiny of counsel's performance "must be highly deferential," and the Court will 'indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." *Moore v. Johnson*, 194 F.3d 586, 591 (5th Cir. 1999) (*citing Strickland*, 466 U.S. at 689). In assessing counsel's performance, a federal habeas court must

make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial. *Strickland*, 466 U.S. at 689; *Neal v. Puckett*, 286 F.3d 230, 236-37 (5th Cir. 2002). "A court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Bell v. Cone*, 535 U.S. 685, 701 (2002) (*citing Strickland*, 466 U.S. at 689). Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise. *Strickland*, 466 U.S. at 689.

The second prong of the *Strickland* test looks to the prejudice effected by counsel's deficient performance. This requires "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *United States v. Mullins*, 315 F.3d 449, 456 (5th Cir. 2002) (*quoting Strickland*, 466 U.S. at 687). "[T]he defendant must show that counsel's errors were prejudicial and deprived defendant of a 'fair trial, a trial whose result is reliable.'" *United States v. Baptiste*, No. 98-207, 2007 U.S. Dist. LEXIS 21388, at *11 n.6 (E.D. La. Mar. 26, 2007) (Engelhardt, J.) (*quoting Strickland*, 466 U.S. at 687). "This burden generally is met by showing that the outcome of the proceeding would have been different but for counsel's errors." *Id*.

B.     *Discussion*

    i.     Failure to Object to Hillary Williams Testimony

7

Moore contends that his trial counsel was ineffective in failing to object to certain testimony of Williams. He argues that Williams, a co-conspirator who began cooperating with the government as a confidential informant on March 19, 2003, gave impermissible hearsay testimony, to which counsel failed to object. He cites two excerpts from Williams's trial testimony, which involve discussions with Corey Juluke ("Juluke") and Rosemary Metz ("Metz")[12], both co-conspirators of Moore.[13]

> Q. But when you talked to Corey Juluke, when you were wired up and you talked to Corey Juluke, did Corey confirm that was heroin he got?
>
> A. Yeah, he said it was heroin and that it was short, and he said that he had short him. It was supposed to be 100 grams. It was a gram or two short. He said it was heroin that came in.[14]
>
> . . .
>
> Q. And did Ms. Rose admit that her son had been angry at her that she spent the money? Did she say about people being mad with her?
>
> A. She said June was mad with her as well as his girlfriend Katina.[15]

Moore concedes that Williams's testimony established that a conspiracy existed between himself, Tunde, Juluke, Williams, and Metz.[16] Moore argues that these statements are hearsay

---

[12] Metz is Moore's mother.

[13] Moore also refers to statements "not specifically cited here." R. Doc. No. 188-2 at 3. The Court, however, declines to speculate which statements Williams seeks to invoke.

[14] Trial transcript at 750.

[15] Trial transcript at 756.

[16] R. Doc. No. 188-2 at 3.

8

because they were (1) not made in furtherance of the conspiracy; and (2) made by a person who was not a co-conspirator at the time the statement was made. The government, meanwhile, contends that during the cited conversations, Williams was not yet working as an informant for the government.

Both parties fail to observe that neither of the statements in question – Juluke's statement that the drugs were heroin but that they were short and Metz's statement that Moore was mad at her and his girlfriend – were made by Williams. Instead, they were made by Juluke and Metz, individuals who were members of the conspiracy.[17] Moore's second line of argument is, therefore, rejected.

The potential remaining barrier to their admission under Federal Rule of Evidence 801(d)(2)(E) is whether these statements were made in furtherance of the conspiracy.[18] "A statement must be 'in furtherance' of the conspiracy in order to fit within the non-hearsay definition of Rule 801(d)(2)(E)." *United States v. Cornett*, 195 F.3d 776, 782 (5th Cir. 1999). The Fifth Circuit "has consistently held that the 'in furtherance' requirement is not to be construed too strictly lest the purpose of the exception be defeated. This rule is not without its limits, however; a statement is not in furtherance of the conspiracy unless it advances the ultimate objects of the conspiracy." *Id.* (citations omitted) "'Mere idle chatter', even if prejudicial and made among co-conspirators, is not admissible under Rule 801(d)(2)(E). Thus, while the in furtherance requirement is not a strict one, it is a necessary one, and the proponent

---

[17] R. Doc. No. 188-2 at 3.

[18] Federal Rule of Evidence 801(d)(2) states in pertinent part: "A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E).

9

of admissibility must satisfy it by a preponderance of the evidence." *Id.* (citations omitted).

Here, the statements were made in furtherance of the conspiracy. Juluke's statement was made to confirm the identity of the drugs contained inside the book, as well as its weight. Meanwhile, Metz's statement was an admission that Moore, her son, had become angry when he learned that Metz had spent money which was owed to Tunde. This debt to Tunde was an underlying cause of the drug importation scheme devised by Moore and his co-conspirators.

Accordingly, Williams's testimony was not hearsay because it fell within the parameters of Rule 801(d)(2)(E). Therefore, any objection thereto by Moore's counsel would have been overruled. "An attorney's failure to raise a meritless argument . . . cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue." *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999). Moore has failed to satisfy the first prong of *Strickland* requiring a showing that counsel's performance was deficient. Therefore, this claim must be **DENIED**.

### ii. Failure to Advise a Guilty Plea

Moore alleges that his counsel was ineffective for failing to properly advise him of the consequences of going to trial instead of accepting a guilty plea.[19] Moore claims that his counsel informed him that his maximum sentencing exposure were he to be found guilty at trial was a 78-month sentence, to run consecutive to the sentence he was serving, based upon a total offense

---

[19] R. Doc. No. 188-2 at 5. The Court notes that at his arraignment before the U.S. Magistrate Judge, Moore acknowledged that he face a 40-year statutory maximum penalty for the offense.

level of 26.[20] He asserts that counsel was ineffective because he did not properly forecast the drug quantity ultimately assessed at sentencing and the leadership role and the obstruction of justice enhancements which were ultimately assessed against Moore.[21] Moore now claims that "had counsel come even a bit close to the correct sentence Petitioner was facing, and had advised a plea as an alternative means of resolving the matter, Petitioner would have considered the advice and <u>would</u> have taken a plea to reduce the exposure."[22]

In essence, Moore wants an opportunity to plead guilty to the indictment with the proper understanding of his likely sentencing exposure. In *United States v. Grammas*, 376 F.3d 433 (5th Cir. 2004), the Fifth Circuit stated as follows:

> Failing to properly advise the defendant of the maximum sentence that he could receive falls below the objective standard required by *Strickland*. When the defendant lacks a full understanding of the risks of going to trial, he is unable to make an intelligent choice of whether to accept a plea or take his chances in court.

*Id.* at 436 (*quoting Teague v. Scott*, 60 F.3d 1167, 1171 (5th Cir. 1995)) (internal quotation marks omitted). The court explained that "*any* additional time in prison [as a result of counsel's error] has constitutional significance," and that the inquiry whether a defendant would have received a lesser sentence absent the error contains two prongs. *Id.* at 438. First, the court must

---

[20] Had Moore been found to have been responsible for 100 or more grams of heroin, but less than 400 grams, his base offense level would have been 26, providing a sentencing range of 78 to 97 months.

[21] At sentencing, this Court applied a base offense level of 28, based upon a finding that Moore was responsible for at least 400 grams but less than 700 grams of heroin. It then assessed a four-point leadership role enhancement and a two-point enhancement for obstruction of justice. Moore's total offense level was, therefore 34, providing a sentencing range of 188 to 235 months.

[22] R. Doc. No. 188-2 at 7.

inquire whether it was "reasonably probable that [the defendant's] decision to plead guilty would have been different had he been properly counseled at to his potential punishment." *Id.* Second, the court must determine "whether a guilty plea would have indeed reduced [the defendant's] sentence." *Id.* The *Grammas* court left both of these factual determinations for the district to make upon remand.

Here, the Court is not satisfied that Moore has met the first prong of the *Grammas* inquiry; that is, he has not shown that it is reasonably probable that he would have plead guilty had counsel informed him of the actual punishment he faced. First, Moore adamantly maintained his innocence at trial, testifying that he was not involved with the heroin importation conspiracy in question.[23] Second, Moore continues to maintain in his § 2255 briefs that he had no knowledge of the conspiracy.[24] It is impossible to reconcile Moore's denial of guilt at trial and his continuing denial of guilt in his habeas motion with his conclusory assertion that he would have plead guilty to the indictment had he been made aware of his sentencing exposure. In order for the Court to have accepted a guilty plea, Moore would have had to sign and admit to a factual basis acknowledging his involvement in the criminal conspiracy, an involvement he has steadfastly refused to acknowledge at every opportunity to do so. Therefore, in light of Moore's trial testimony and his continuing profession of innocence, the Court declines to find that Moore would have plead guilty had he known of his actual sentencing exposure in 2004.

Therefore, even assuming deficient performance by counsel and that a guilty plea would have resulted in a lesser sentence, Moore cannot show *Strickland* prejudice because he has not

---

[23] *See, e.g.*, Trial transcript at 1142, 1153-55, 1182-83, 1253, 1258,

[24] *See* R. Doc. No. 222 at 4; R. Doc. No. 208 at 3.

met his burden of showing that he "would have pleaded guilty if he knew of the true criminal penalty he faced." *Id.* at 438. Accordingly, this claim must be **DENIED**.

### iii. Failure to Compel Discovery

Finally, Moore asserts that his counsel's failure to compel the government to preserve and produce audio recordings and monitoring logs constituted ineffective assistance of counsel. Moore contends that certain alleged phone conversations between himself and his co-conspirators would have created a reasonable doubt as to his involvement in the conspiracy.[25] To support his contention, Moore has reconstructed two alleged phone conversations, one between himself and Tunde sometime between April and June of 2003 and the other between himself and Metz sometime between April and May of 2003.[26] The recordings of these alleged conversations would have been destroyed, pursuant to a Bureau of Prisons policy, 180 days after their creation.[27]

During the alleged conversation with Tunde, Moore states that he had not spoken to Williams "in almost a year."[28] Meanwhile, during the alleged conversation with Metz, Moore expresses surprise that Tunde would be speaking with Williams and sending books to Williams

---

[25] R. Doc. No. 208 at 1-2.

[26] Moore has set forth the dates and durations of these alleged conversations in his supplemental memorandum. He has not, however, specified the precise date of the two particular conversations which he has recreated.

[27] R. Doc. No. 140-2 at 11.

[28] R. Doc. No. 208 at 3-4.

on Moore's behalf.[29] According to Moore, the recordings of these conversations would show that he had no involvement in the conspiracy to import heroin from Nigeria.

Moore asserts, in conclusory fashion, that had counsel "done what he was supposed to do" and compelled disclosure of these alleged conversations, "he would have presented his defense much differently, and the outcome of the proceeding would have been different."[30] Essentially, Moore argues that his counsel failed to act quickly enough to preserve the audio recordings and phone logs before they were destroyed by the Bureau of Prisons, pursuant to its policy.[31] Moore, however, does not allege when, if ever, he informed counsel of the contents of these alleged conversations.[32] Meanwhile, the government, pursuant to its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), was under a continuing obligation to disclose favorable evidence, material to guilt or punishment, in its possession to the defense. The Fifth Circuit has already held that there was no *Brady* violation in this case.[33] Moreover, the record shows that Moore, in a *pro se* capacity, filed a motion to preserve "all telephone calls recorded from 2000-2003 in F.C.I. Yazoo."[34] The U.S. Magistrate Judge deemed the government's response to this

---

[29] R. Doc. No. 208 at 4.

[30] R. Doc. No. 208 at 5.

[31] *See* R. Doc. No. 140-2 at 11 & n.26.

[32] Moore also alleges, in a footnote, that his "appellate counsel was ineffective in failing to elicit" the reconstructed conversations in order to present them to the Fifth Circuit on appeal. R. Doc. No. 208 at 4 n.1. However, Moore does not explain how appellate counsel would have known of the contents of these alleged conversations, nor does he contend that he informed appellate counsel of said contents. For essentially the same reasons that his claim concerning trial counsel is denied, Moore's claim that appellate counsel was ineffective is **DENIED**.

[33] R. Doc. No. 140-2 at 8-11.

[34] R. Doc. No. 17 at 2-3.

motion sufficient, noting the government's duty to immediately provide the defense with any *Brady* material.[35] The Court concludes that Moore's counsel cannot be deemed ineffective for failing to compel discovery of these alleged audio recordings, when (1) nothing in the record suggests that Moore advised counsel of their existence or their contents;[36] and (2) the government has been held to have complied with its *Brady* obligations in this case. Moore's claim, therefore, fails the first prong of the *Strickland* standard. Accordingly, this claim must be **DENIED**.

### III. CONCLUSION

Accordingly,

**IT IS ORDERED** that Moore's motion pursuant to 28 U.S.C. § 2255 is **DENIED** in all respects.

New Orleans, Louisiana, June 8, 2009.

                    **LANCE M. AFRICK**
                  **UNITED STATES DISTRICT JUDGE**

---

[35] R. Doc. No. 25.

[36] The Court notes that nothing precluded Moore from testifying to these conversations at trial. Had these conversations been as critical to his defense as Moore now alleges, there is no reason why he could not have testified about them, while arguing that they had been destroyed by the government.